(100 App. Div. 119)

### HUNT v. DEXTER SULPHITE PULP & PAPER CO.

(Supreme Court, Appellate Division, Fourth Department. January 4, 1905.)

1. **DEATH OF EMPLOYÉ—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.**
   Evidence, in an action for the death of an employé by the explosion of a digester in a paper mill, examined, and *held* sufficient to support a finding of negligence on the part of the employer.

2. **SAME—CONTRIBUTORY NEGLIGENCE.**
   Evidence, in an action for the death of an employé, examined, and *held* insufficient to show that the deceased was guilty of contributory negligence.

3. **SAME—BURDEN OF PROOF.**
   Where contributory negligence is alleged in an action for the death of an employé, plaintiff has the burden of disproving such negligence.

4. **SAME—ASSUMPTION OF RISK.**
   In an action for the death of an employé, defendant has the burden of showing assumption of risk.

5. **CREDIBILITY OF WITNESSES.**
   Where the testimony is conflicting, the credibility of witnesses is for the jury.
   McLennan, P. J., and Stover, J., dissenting.

Appeal from Trial Term, Jefferson County.

Action for wrongful death by Alice C. Hunt, as administrator of the estate of George A. Hunt, deceased, against the Dexter Sulphite Pulp & Paper Company. From a judgment for plaintiff, and from an order denying a new trial on the minutes, defendant appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

¶ 3. See Master and Servant, vol. 34, Cent. Dig. § 908.

Purcell, Walker & Burns, for appellant.
Kilby & Norris, for respondent.

WILLIAMS, J. The judgment and order should be affirmed, with costs, after reducing it to $5,000.

The action was to recover damages for the death of plaintiff's intestate, alleged to have been caused by the negligence of the defendant. The death resulted from the explosion of a digester in the defendant's mill in the early morning of Sunday, January 18, 1903. The questions raised by this appeal relate to the defendant's alleged negligence, the contributory negligence of deceased, his assumption of the risk of the accident, the amount of the verdict, and the exceptions to evidence and to the charge of the court. The only question of negligence on the part of the defendant submitted to the jury related to alleged defects in the digester, and it was necessary that the proofs should show the existence of such defects, that the defendant knew or should have known of them prior to the accident, and failed to repair them. The verdict of the jury involved a finding of these facts, and the question is whether there was evidence to support such finding.

The digester was 42 feet long and 14 feet in diameter. It was composed of a steel shell, seven-eighths of an inch thick, with a thin inside lining of litharge or sheet-lead. Next to this lead, inside, was a coating of cement about two inches thick, and inside this cement were two courses of brick, the one next the cement laid flat and the other edgewise, and all was cemented inside the shell, making a complete arch 12 or 13 inches thick. The digester was placed horizontally in the mill, and had manholes in the top to receive the material, and manholes in the bottom to remove the product manufactured. The method of using the digester was to put in some water and turn the steam into the coils of lead pipe inside the digester, so as to heat the water gradually up to boiling for 24 hours, and thus warm the digester and equalize the expansion of the steel shell and brick lining. This water was then all drawn off, and the wood chips put in the digester and steam turned on, subjecting them to a process of slow steaming at low pressure. Then a solution of sulphurous acid and limestone was turned in upon the chips, filling the digester to within about two feet of the top, and leaving that space as a chamber for the escaping gas to collect. The steam was then turned on, and the acid heated and cooked until the chips were reduced to a pulpy mass. The whole process took from 45 to 75 hours. The explosion took place during the cooking process above referred to. During this process there was usually 40 to 45 pounds pressure from the inside of the digester outwards. This was a safe pressure, and at the time of the accident the pressure was not above these figures, as indicated by the gauge thereon. There seems to be no evidence contained in the record as to what this pressure was caused by, whether loose steam in the digester, or the gases in the chamber above the cooking material, and the heat in the digester and materials. There were coils of steam pipe on the inside of the digester, and, in order

to heat the water first put in the digester, the steam was turned through these coils.   After the chips were put into the digester the steam seems to have been thrown directly upon the chips, but, after the acid was turned upon the chips, whether the steam was turned through the coils of pipes, or loosely upon the materials being cooked, the evidence fails to show.   This may have been made clear in some way upon the trial to the court and jury, but the record here fails to throw any light upon the subject.   If the steam being used in the digester at the time of the explosion was confined within the coils of pipe, it is not apparent how any steam pressure could have contributed to the explosion, unless the coils of pipes also exploded, and of this there is no evidence.   Eliminating the steam pressure from the causes for the explosion, we have left the gases in the chamber above the cooking material, and the heat in the body of the digester and materials.   There is no evidence in the record as to the pressure that would be caused by these gases and this heat.   We are only informed by the evidence that there was a pressure of about 42 pounds just before the explosion occurred; and then it appears the steel shell did give way, and an explosion took place which wrecked the building and displaced the other digesters in the same room.   This explosion was, of course, the result of some pressure from the inside, and it is claimed that no explosion would have occurred if the steel shell had not been defective.   No high pressure was indicated by the gauge, and there is no suggestion that the gauge did not operate correctly and properly measure the pressure actually operating from within against the shell of the digester.   Evidence was given tending to show that the digester was 17 years old, and that it had been patched several times, the patches running along the top nearly its entire length; that these patches were fastened to the shell by cap screws, and no rivets were used, as usual in such cases; that the object of the lining to the shell was to keep the acid from the steel; that the lining had been allowed to get out of repair from time to time, so that the acid had penetrated to the shell, and the fluid and gas had oozed out around the screws, cutting off the threads, and so making the shell along the top, where the patches were located, weak, and that the shell was eaten and weakened by the contact of the acid; and that the shell broke, at the time of the explosion, along the top where the patches were.   There was evidence tending to show that the officers and agents of defendant, whose duty it was to keep the digester in repair, had knowledge of its unsafe condition before the explosion, and neglected properly to repair it and put it in a safe condition.   There was evidence given on the part of the defendant tending to show the digester was not in an unsafe condition to the knowledge of or with notice to the defendant; that its defects, whenever they developed, were repaired at once; that reasonable care and inspection were exercised, and all possible precaution taken, to avoid any accident in the use of the digester; and that the defects that caused the accident were not discoverable by the exercise of any reasonable precautions.   All this evidence made the question of defendant's negligence one of fact for the jury.

If a digester in proper order would resist a pressure of 45 pounds, and this one exploded by reason of a pressure of only 42 pounds, it must necessarily have been in a defective condition. We cannot say that the verdict rendered was, as to this issue, contrary to or against the weight of the evidence. It could not certainly be said, as a matter of law, that there was no negligence.

The questions of assumed risk and contributory negligence in this case rest alike upon the proposition that the deceased knew or should have known of the defective condition of the digester, and nevertheless continued to work about the same (except that, as to contributory negligence, it is said he failed to relieve the pressure upon the digester when his attention was called to conditions requiring such relief). He was not bound, as matter of law, to know all that the defendant was required to know about the safety of the digester. The defendant was charged with the duty of inspection; the deceased was not. No one supposed there was danger of an explosion. The deceased, from his observation, did not apprehend such an accident. The defendant failed to discover the danger, as claimed by plaintiff, because, by its officers and agents, it failed to inspect with sufficient care, and to repair, such defects as its inspection discovered to exist. We cannot say, as matter of law, that the deceased knew or should have known of the defects which finally caused the explosion. It was for the jury to pass upon this question, and we cannot say that their finding for the plaintiff upon this issue was contrary to and against the weight of the evidence.

The more serious claim made by defendant is that the deceased realized the danger on the night of the accident, and the conditions were such as required him to relieve the pressure on the digester, and he neglected to do this. Evidence was given upon this subject by Campbell, Slough, and Babcock. Campbell was defendant's superintendent, and testified to an interview with deceased about the cracking of a digester on a former occasion when he was cook, and did not relieve the pressure; that deceased acknowledged he knew it was dangerous; and that he (Campbell) instructed him in the future to relieve the pressure if cracking was heard, and told him how to do it, and also told him to inform the room superintendent at once, and assume no responsibility himself. Slough was an employé of the defendant, and was night watchman the night before the explosion, and testified that Hunt said that about 1 o'clock there was some cracking noise in the digester, and that they were going to run their chances cooking the material off; that Pound was present at this talk; that Hunt and Pound were there by the digester together. Pound was assistant to Hunt, as cook, and was with him until a few minutes before the explosion, when he went out into the boiler room. He denied that any such conversation took place in his presence as that testified to by Slough. Then Babcock, a superintendent of defendant, testified as to what Pound said to him about the cracking of the digester that night. The credibility of these three witnesses was attacked on the trial by plaintiff. The deceased could not contradict Slough. Pound did, however, and whether Slough or Pound told the truth was a

question for the jury.   The deceased could not contradict Camp-
bell, but, whether contradicted by other witnesses or not, his credi-
bility, he being superintendent of the defendant, charged with the
negligence which caused the accident in question, was for the jury.
Volkmar v. M. R. Co., 134 N. Y. 418, 31 N. E. 870, 30 Am. St. Rep.
678.   Whether Pound or Babcock told the truth in their conflicting
evidence was a question of fact for the jury.   We make no sugges-
tions as to the credibility of these various witnesses.   Counsel for
defendant has done that here, as he very likely did before the jury.
It is sufficient for us that there was a conflict upon a question of
fact for the jury.   We cannot say that the finding in favor of the
plaintiff was contrary to or against the weight of the evidence.
The plaintiff had the burden of proof as to contributory negligence;
the defendant, as to assumed risk.

We have examined the various exceptions to evidence and the
charge, and do not find any that require a reversal of the judgment
and order.   The service of a typewritten notice under the employ-
ers' liability act was the serving of a sufficient notice in writing.
Typewriting has largely taken the place of handwriting, and may
well be considered as handwriting.   It would be too strict a con-
struction of the statute to hold this notice invalid because in type-
writing instead of handwriting.

The judgment and order should be affirmed, with costs.   All
concur, except McLENNAN, P. J., who votes for an absolute re-
versal upon the ground of failure to establish freedom from con-
tributory negligence, and STOVER, J., who votes for an absolute
reversal on the ground of failure to establish negligence on part of
defendant, and freedom from contributory negligence.